"The fourth defense in the answer is not affirmative in its character. It really amounts to nothing more than a denial of the plaintiff's alleged cause of action. It adds no strength to the answer, and could be wholly stricken out without detriment to the rights of the defendant. Considering it, therefore, with reference to its legal effect, which is simply that of a denial, it cannot properly be regarded as setting up any such claim as to render it proper to require a bill of particulars."

The present case is clearly distinguishable from that one, as it does add strength to the answer, and could not be wholly stricken out without detriment to the rights of the defendant, and answers the description laid down in Dwight v. Germania Life Ins. Co., 84 N. Y. 493, 504, of the tests. which determine whether the claim is of such a character that a bill of particulars may be ordered, in which case it was said:

"In our view the claim spoken of by that section [meaning section 531 of the Code of Civil Procedure], where the case of a defendant is in hand, is whatever is set up by him as a reason why the action may not be maintained against him. The claim of the defendant is that ground of fact which he alleges in his answer as the reason why judgment should not go against him. His claim in the case is the position he takes in his pleading, based upon the facts he sets up and the law applied thereto, why he should go without day."

But while the defense in question answers in its general character the requirements of the· above description, it nevertheless lacks certain other elements necessary to warrant the ordering of a bill of particulars. Both sides have assumed that there was a question of amount presented by this defense, but such is not the fact. To be sure, the sum of $5,000 is mentioned, but this is incidental only; the essence of the defense being that the moneys mentioned in the first two causes of action were advanced or paid by the plaintiff in accordance with the terms of an agreement which the defendant has fully performed on his part, such performance depending, not upon his contributing $5,000, or any other definite sum, but his "earnings," whatever they might be. This confusion may have arisen from the form of the bill of particulars voluntarily served by the defendant, which presents certain categories not based upon anything contained in the pleadings, and which, therefore, present false issues. The motion for a further bill of particulars should, therefore, be denied, but without costs.

Motion denied, without costs.

<hr />

(44 Misc. Rep. 156.)

KISSEL et al. v. CHICAGO & E. I. R. CO. et al.

(Supreme Court, Special Term, New York County. June, 1904.)

1. INJUNCTIONS—IRREPARABLE INJURY—RAILROADS—ACTION BY STOCKHOLDERS —ISSUE OF BONDS.

Plaintiffs, stockholders of a railroad company, sued to restrain defendant railroad companies from issuing bonds covering a traffic agreement between defendants. It appeared that one defendant, F. Co., had acquired control of the defendant the S. Co.; that its earnings did not meet its fixed charges; that such defendant had also acquired voting control of the E. Co., of which plaintiffs were stockholders, which was. a profitable road; that defendant F. Co. had procured control of the same by issuing to stockholders trust certificates under an agreement to pay semiannual

dividends on the par value of the shares, and a certain price per share in the future for each share of stock represented by the certificates; that thereafter the defendants entered into an agreement between themselves as to the traffic transmitted over the lines, for an interchange of a sufficient amount of traffic to create a semiannual revenue sufficient to meet the interest on the bonds of the S. Co. under the refunding scheme. Plaintiffs charged that the traffic agreement was in fact a mortgage imposed without consideration on the property of the road in which they were stockholders. It appeared that before the injunction was issued a certain proportion of the bonds had been certified and delivered to the parties entitled to them. *Held*, that innocent purchasers of the bonds took the interest subject to all defenses, legal and equitable, of the debtor who issued the security, and therefore the claim of plaintiffs that they would suffer irreparable injury if the bonds passed into the hands of purchasers for value and without notice was untenable, and that plaintiffs had no right on that ground to an injunction restraining the issuing of the bonds, or to its continuance.

Action by Gustave E. Kissel and Susan Raumer against the Chicago & Eastern Illinois Railroad Company and others. Motion to continue injunction pendente lite denied.

Winthrop & Stimson (Elihu Root, Austen G. Fox, and Henry L. Stimson, of counsel), for plaintiffs and the motion.

Butler, Notman, Joline & Mynderse (Will Hartwell Lyford and Adrian H. Joline, of counsel), for defendants Chicago & E. I. R. Co., St. Louis & S. F. R. Co., and St. Louis, M. & S. E. R. R. Co.

Hornblower, Byrne, Miller & Potter (James Byrne, of counsel), for defendant New York Security & Trust Co.

Sheehan & Collin (John L. Wells, of counsel), for defendant Colonial Trust Co., opposed.

GIEGERICH, J. This is a motion to continue an injunction pendente lite restraining the issuance of a series of bonds and notes secured by a mortgage covering, among other things, a traffic agreement made between the railroad companies, defendants, and also to restrain the payment of certain moneys under such traffic agreement. The facts, so far as material, are as follows: The defendant the St. Louis & San Francisco Railroad Company (hereinafter called the San Francisco Company) is engaged in consolidating and building up an extensive railroad system by acquiring control of and grouping together various lines and systems previously operating independently and under boards of directors selected by their respective stockholders. One of the railroads thus acquired is the defendant the Chicago & Eastern Illinois Company (hereinafter called the Eastern Illinois Company), which for a number of years prior to the consolidation in 1902 had been operated at a profit; the dividends paid in the years 1901 and 1902 having amounted to 6 per cent. per annum, besides which a surplus was accumulated, the net earnings during the year 1902 having amounted to more than 10 per cent. on the common stock after the payment of all prior charges. Another company thus acquired was the defendant the St. Louis, Memphis & Southeastern Railroad Company (hereinafter called the Southeastern Company), which was not so old or successful as the Eastern Illinois Company, and whose credit

was not established, and whose earnings thus far have been insufficient to meet the fixed charges; the bonded indebtedness on the different portions of the system aggregating nearly $15,000,000. The stock of this company was acquired by the San Francisco Company by the issuance of the latter's collateral trust gold notes in the aggregate amount of $4,000,000, which notes are still outstanding. There has also been more than $3,500,000 expended by the San Francisco Company in the construction and completion of the lines of the Southeastern Company since its acquisition by the former. The terms under which the San Francisco Company obtained control of the Eastern Illinois are, concisely stated, as follows: A very large amount of the common stock was acquired by the San Francisco Company, and was deposited by it with the Colonial Trust Company, as trustee, under a trust agreement entered into between said trust company and the San Francisco Company; the various stockholders who thus parted with their stock to the latter receiving back from the trust company stock trust certificates. Under this trust agreement, the San Francisco Company was to pay to the registered holders of the trust certificates on the 1st day of July, 1942, or, at its option, on any earlier dividend day, the sum of $250 for each share of stock represented by the certificates, and was also to pay semiannual dividends at the rate of 10 per cent. on the par value of the shares. It was also provided in the trust agreement that if the San Francisco Company failed to pay such dividends promptly, or if it defaulted in other respects therein specified, the registered holder of the trust certificates might surrender the same, and should receive back in exchange his certificates of stock. In the meantime the San Francisco Company was to have the power of voting upon all stock held by the trust company for the election of directors, and for every other purpose not contrary to the covenants or guaranties on its part particularly set forth in the instrument, and also to receive all dividends declared on the stock so deposited. Since the consummation of this agreement, the San Francisco Company has elected the directors and officers of the Eastern Illinois Company, more than a majority of such directors having been continuously persons who were also directors of the San Francisco Company, as it has similarly selected the officers and directors of the Southeastern Company, formerly referred to, and neither the Eastern Illinois nor the Southeastern Company has any separate or independent action as distinct from the San Francisco Company. Such being the situation on or about April 14, 1904, an instrument called a "traffic agreement" (being the contract complained of) was executed between the San Francisco and Eastern Illinois Companies on the one part, and the Southeastern Company on the other, whereby the Southeastern Company, whose lines are intermediate those of the other two, bound itself to deliver to them, respectively, all traffic transported over any of its lines, and destined to any point upon either of their lines; such deliveries to be made "at the most convenient junction points" between the said railroads. On the other hand, the San Francisco and the Eastern Illinois Companies bound themselves jointly to col-

lectively interchange with the lines of the Southeastern Company a sufficient amount of traffic during the term of the agreement to produce, taken with the local and other traffic of the Southeastern Company, an aggregate semiannual net revenue to the latter of not less than $485,000 over and above all expenses of maintenance, operation, repairs, renewals, and taxes; being the precise amount necessary to pay the interest under the refunding scheme proposed. The plaintiffs complain of this traffic agreement, and charge that it is not in fact what it purports to be, but is in reality a disguised mortgage upon the Eastern Illinois property, imposed without authority or real or adequate consideration, and without regard to the interests of that company, but for the purpose of making use of the credit of its established and dividend-earning railroad in order to float the $16,000,000 bond issue above mentioned upon the property of the heretofore unprofitable Southeastern system. It is urged by them that as stockholders, the Colonial Trust Company, as trustee, having refused to act, they are entitled to maintain the suit in their own right and name.

Many interesting and important questions are pressed upon my attention by the distinguished counsel on either side, such as what the real relation of the parties is under such circumstances; whether the holders of the stock trust certificates are to be deemed the owners of the stock until it is paid for; or whether the San Francisco Company is the owner, and the holders of the stock receipts are only creditors; also various questions as to the construction of the several covenants and provisions in the trust agreement; likewise questions of fact as to whether the traffic agreement is a prudent and beneficial one for the Eastern Illinois Company, or whether it is an improvident, if not a fraudulent, one. In the view I take of the case, however, it is unnecessary to consider more than the single question whether innocent purchasers for value of the bonds will be in any better position to enforce this traffic agreement against the Eastern Illinois System than would the original party to the agreement, the Southeastern Company, through whom they would derive their right; that company having included this traffic agreement with other assets under the mortgage given to secure these bonds. The well-established rule of law in the case of a chose in action is that the purchaser acquires no greater right than his vendor had. In Bush v. Lathrop, 22 N. Y. 535, 538, the Court of Appeals said: "All the cases agree that the purchaser of a chose in action takes the interest purchased, subject to all the defenses, legal and equitable, of the debtor who issued the security"; quoting Lord Thurlow in Davis v. Austin, 1 Ves. Jr. 247, that "a purchaser of a chose in action must always abide by the case of the person from whom he buys." This rule, as laid down in Bush v. Lathrop, supra, was said in Fairbanks v. Sargent, 104 N. Y. 108, 9 N. E. 870, 6 L. R. A. 475, 58 Am. Rep. 490, to stand in full force and unquestioned, except to the extent that where the real owner has, by the act of investing another with apparent ownership of the property, estopped himself from disputing such title, the rule does not apply. The learned counsel for the plaintiffs argue that if the doctrine of Crocker v. Crocker, 31 N. Y. 507, 88 Am. Dec. 291, Leitch v. Wells,

48 N. Y. 585, and Weaver v. Barden, 49 N. Y. 286, which related to stock corporations or securities, should be held to apply to choses in action like a contract, as here the traffic agreement, the plaintiffs would suffer irreparable injury if these bonds should be suffered to pass into the hands of innocent purchasers. A sufficient reply to this argument is that the courts have not shown any tendency to thus extend the doctrine of the authorities last mentioned, but, on the contrary, to reassert the original rule. See Central Trust Co. v. West India Imp. Co., 169 N. Y. 314, 324, 62 N. E. 387, and cases cited. The cases cited by the learned counsel for the plaintiffs dealt, as before said, with stock or securities, and not with contracts of the ordinary character. Furthermore, an examination of those cases will show that the plaintiffs were estopped by reason of their having by their own act conferred apparent title on others. In the case in hand, so far from being guilty of any act which could be construed as an estoppel, the plaintiffs have shown the utmost diligence and energy in attacking the contract in question, and no one hereafter, whether a bondholder or other, will have good ground for complaining in this respect of anything that the plaintiffs have done or left undone. Unless the rule of Bush v. Lathrop is held applicable to such a case as is here presented, it is difficult to conceive a case to which it would apply. Where a going concern mortgages all its assets, including outstanding contracts, if the mortgagee or the owners of bonds secured by the mortgage should be held to have any greater or different rights than the concern itself upon such contracts, intolerable confusion and injustice would result. Moreover, bonds aggregating upward of $15,000,000 worth of the entire issue of $16,000,000 have already been certified, and about half of them delivered by the trustee to the parties entitled thereto, and the other half passed to the credit of such parties prior to the issuance of the injunction. Under all these circumstances, I think it is plain that the branch of the injunction which relates to the issuance of the bonds should not be continued. That the injunction, so far as it relates to the notes, should be dissolved is, as I understand the matter, practically conceded since the argument, as the trust agreement by which they are secured does not refer to the traffic agreement. So far as the other portion of the injunction order is concerned, namely, that which restrains the Eastern Illinois Company from paying out any moneys of that company on account of the guaranty of net income of the Southeastern Company, it does not appear by the terms of the agreement objected to or otherwise that any such moneys will be paid out until after the action can be tried and determined in its regular order.

The motion to continue the injunction is therefore denied, with $10 costs.

Motion denied, with $10 costs.