KISSEL et al. v. CHICAGO & E. I. R. CO. et al.

(Supreme Court, Appellate Division, First Department.  June 26, 1908.)

CORPORATIONS—ACTIONS BY MINORITY STOCKHOLDERS—GROUNDS.

 The F. Railroad Company procured control of the C. Railroad Company by issuing to its stockholders trust certificates under an agreement to pay semiannual dividends thereon and a specified sum at a designated future date for each share.  The stock was delivered to a trustee as security for the performance of the agreement, which bound the F. Company not to sanction the issue of any bonds or certificates of indebtedness by the C. Company, except for specified purposes, until the stock had been paid, etc.  Thereafter the F. Company, having acquired control of the S. Railroad Company, entered into a traffic arrangement for an interchange of traffic between the three railroads to create revenue sufficient to meet the bonds of the S. Company.  *Held*, that minority trust certificate holders could not, before default by the F. Company, maintain a suit to declare the traffic agreement void, though the same violated the trust agreement.

 Clarke and Scott, JJ., dissenting.

Appeal from Trial Term.

Action by Gustav E. Kissel and another against the Chicago & Eastern Illinois Railroad Company and others.  From a judgment declaring void a traffic agreement and enjoining the payment of moneys thereunder, certain of the defendants appeal.  Reversed, and complaint dismissed.

Argued before PATTERSON, P. J., and INGRAHAM, McLAUGHLIN, CLARKE, and SCOTT, JJ.

W. H. Lyford and Joline, Larkin & Rathbone (Adrian H. Joline on the brief), for appellant railroad companies.

Byrne & Cutcheon (James Byrne, of counsel), for appellant New York Security & Trust Co.

Henry L. Stimson and Winthrop & Stimson (Bronson Winthrop, Albert W. Putnam, and Felix Franfurter, on the brief), for respondents.

INGRAHAM, J.  The situation, as it existed at the time this contract, which the court has set aside, was made, was as follows:

The defendant Colonial Trust Company was the owner of substantially all of the stock of the Chicago & Eastern Illinois Railroad Company in trust to secure the payment of certain obligations of the St. Louis & San Francisco Railroad Company under an agreement between the St. Louis & San Francisco Railroad Company, called the "San Francisco Railroad Company," of the first part, and the Colonial Trust Company, the predecessor of the defendant, the Trust Company of America, of the second part.  It recites that the Chicago & Eastern Illinois Railroad Company, called the "Chicago Company," was a corporation organized under the laws of the states of Illinois and Indiana, and was the owner of a line of railroad in the state of Illinois; that the railroads of the Chicago Company and of the San Francisco Company connect and form a continuous line of railroad; that the Chicago Company has a capital stock of $25,000,000, being 250,000 shares of stock, of which the plaintiffs own 7,500 shares; that the San Francisco

Company proposed to purchase all the shares of common stock of the Chicago Company, and in payment of the purchase price of the shares of said common stock which the railroad company may purchase had determined to issue a 10 per cent. stock trust certificate of the railroad company; that the San Francisco Company would pay to the registered holder of these stock trust certificates, on the 1st of July, 1942, at the office of the trust company in the city of New York, the sum of $250 in respect of each share of said stock represented by the stock trust certificates of the surrender hereof, and on such payment the railroad company would be entitled to receive from the trust company certificates of common stock of the Chicago Company to the amount therein enumerated; that until the 1st day of July, 1942, or the earlier redemption of the stock trust certificates, the San Francisco Company would pay to the registered holders thereof a dividend of $5 on each share of said stock represented by the stock trust certificates semiannually on the 1st days of January and July ensuing the sale of the certificates; that, if the San Francisco Company should fail to pay any such dividend within 30 days after demand shall have been made on the company, then, such default so continuing, the registered holders of the certificates might surrender the same to the trust company, and in exchange therefor upon demand should be entitled, subject to the provisions of the trust agreement, to receive certificates for shares of common stock of the Chicago Company to the amount enumerated; that the San Francisco Company had the right to pay the amount provided for on any day when a dividend was payable, whereupon the company would be entitled to receive from the trust company the shares of common stock held by the trust company, and all liability on the part of the San Francisco Company would then cease; that the stock certificate was issued under the trust agreement between the San Francisco Company and Colonial Trust Company, to which reference was made for the nature and extent of the security, the rights of the holders of the stock trust certificates, and the terms and conditions upon which the stock trust certificates could be issued and were secured.

The agreement then provided that, to secure the payment of these stock certificates and of the dividends to accrue thereon, the San Francisco Company assigned, transferred, pledged, and set over to the trustee all shares of common stock of the Chicago Company which the railroad company might have acquired or might at any time acquire, to have and to hold all and singular said shares of common stock unto the trustee and its successors in the trust, and its or their assigns, in trust, nevertheless, for the common and equal benefit and security of all and singular the person or persons who should from time to time be holders of the stock trust certificates, and without preference, subject to the terms, provisions, and stipulations in the stock trust certificates contained, and for the uses and purpose and upon and subject to the terms, conditions, provisos, and agreements thereinafter expressed and declared. It was then provided that upon payment of the sum of money in the stock certificates mentioned, for principal and dividends, the estate, right, title, and interest of the trustee in the trust and in the trust estate should cease, determine, and become void,

and the trustee should assign or cause to be assigned, and should deliver, the stock held in trust to the San Francisco Company or its assigns, and should cancel and satisfy the trust agreement; that the trustee should cause to be transferred into its name, or into the name or names of its nominee or nominees, all shares of the common stock of the Chicago Company, certificates of which should be delivered to the trustee hereunder, and until some default be made in the obligations of the San Francisco Company to pay the amount required to be paid to the trustee, or default be made in the payment of the principal or interest on any mortgage bond of the Chicago Company, or default be made in the payment of the rent reserved under any lease made to the Chicago Company, or default be made in the payment or performance of any other of the covenants, conditions, and agreements on the part of the San Francisco Company in the stock trust certificates or in this trust agreement contained, or until a permanent receiver of the Chicago Company should be appointed, that the trustee should not collect or be entitled to collect any of the dividends from time to time declared on the stock of the Chicago Company held by the trustee under the trust agreement; and that the trust company shall pay over to the San Francisco Company all dividends collected by it.

The agreement further provides that the San Francisco Company should have the right, not being in default under the stock trust certificates or under this trust agreement, to vote upon all shares of the stock of the Chicago Company at any time held by the trustee thereunder for every purpose not contrary to the covenants or guaranties on the part of the railroad company set forth in article 7 of the agreement, to which attention will be called, and without prejudice to such general power the San Francisco Company should have the right to vote to authorize the Chicago Company to issue its stock, common or preferred, or to issue bonds for the purpose of paying, redeeming, or refunding the outstanding obligations of the Chicago Company, or bonds or other obligations of other corporations secured by a mortgage or deed of trust upon property then owned or operated by the Chicago Company or in which the Chicago Company may then have an interest, or for constructing, purchasing, or acquiring in some other manner other lines of railway or other property or interest therein, or stock or bonds or other obligations of other railway companies, or of acquiring additional property, or of providing means for betterments, improvements, or additional equipment for the use of the Chicago Company, or of reimbursements to the Chicago Company for expenditures made by it after the 1st day of July, 1902, or for some one or more of the foregoing purposes, and for general refunding or repaying purposes, and to vote to authorize the Chicago Company to mortgage its railways, franchises, and property to secure any bonds so issued; and the San Francisco Company, not being in default as aforesaid, the trust company should from time to time, on the demand of the railroad company, cause to be executed and delivered to the railroad company or its nominees suitable powers of attorney to vote on such shares. It was further provided that if the San Francisco Company should make default in the payment of any of the principal of the stock trust certificates or of the dividends to accrue thereon,

or in the observance or performance of any other of the covenants or guaranties of this trust agreement on its part, then from and after such default, and as long as such default should continue, the trustee should exercise, in its absolute discretion, for the sole and exclusive benefit of the holders of the stock trust certificates from time to time outstanding, all the rights of owners of such common stock from time to time held by the trustee and not withdrawn by holders of the stock trust certificates, and should exercise the voting power on said stock in its discretion, and should collect the dividends on said stock and apply the same as provided in section 3 of article 6.

Article 6 of the agreement provides for the event of a default of the San Francisco Company in the payment provided for in the trust certificates, in case such default should continue for the space of 30 days after demand therefor should have been made on the San Francisco Company at the office of the Trust Company, or in case of the other events which are called defaults by section 2 of that article. In such a case the trustee should, upon the written request of the holders of two-thirds in amount of the stock trust certificates then outstanding, and not otherwise, by notice delivered to the San Francisco Company, declare all stock trust certificates then outstanding to be due and payable immediately, and the holders of the stock trust certificates should then become entitled to receive the shares of stock therein specified from the trustee; that, if any one or more of the "events of default" should happen, then and in every such case, during the continuance of such default, the trustee might vote upon all such shares of stock in its discretion, and should revoke any powers of attorneys or proxies which it may have executed at the request of the railroad company. In the event of a default the trustee might, subject to any right of withdrawal under the article, in its discretion, and should at the request of the holders of a majority in amount of the stock trust certificates then outstanding, proceed to sell and convert into money the stock held in trust. The trustee, however, instead of exercising the power of sale, might, in its discretion, proceed by suit or suits, as the trustee may be advised by counsel, to enforce the payment of the stock trust certificates and to enforce the trust agreement, and all remedies conferred by the trust agreement should be deemed cumulative and not exclusive; and the holders of not less than two-thirds in amount of the stock trust certificates outstanding should have the right from time to time, if they so elect, to direct the method and place of conducting any and all proceedings for any sale of the trust estate, or for the enforcement of the trust agreement, or any action or proceeding thereunder, and two-thirds in amount of the stock trust certificates at the time outstanding might waive by written notice to the San Francisco Company and to the trustee any default under the trust agreement or under the stock trust certificates, and waive the exercise by the trustee of any power conferred upon the trustee under the trust agreement, and might waive any right consequent upon such default to withdraw common stock in exchange for stock trust certificates, and such action or waiver by holders of not less than two-thirds in amount of the stock of the stock trust certificates should be binding on all holders of the stock trust certificates.

Article 7 of the agreement imposes certain obligations upon the San Francisco Company. That company becomes bound to pay the principal and dividends accruing under the certificates, without deduction from either principal or dividend for any tax or taxes; to pay and discharge all taxes, etc., imposed upon the trust estate, or any part thereof, the principal and interest of all bonds of the Chicago Company, all rent reserved in any leased property to the Chicago Company, and all taxes and assessments which might be imposed upon the property of the Chicago Company, and undertakes that, until all the stock trust certificates shall have been paid, it (the San Francisco Company) will not sanction or permit the issue or use of any stock, bonds, or certificates of indebtedness of the Chicago Company, or the use of the proceeds thereof, except for certain specific purposes; but any bonds, stock, or certificates of indebtedness that might be issued to refund, repay, or reimburse any sinking fund payments theretofore made should be used only for some one or more of the preceding purposes in this covenant stated. Until all the stock trust certificates should be paid, no part of the property and assets standing on the 15th of August, 1902, on the books of the Chicago Company charged to the account thereon designated "Trust Assets," or the proceeds of any such assets, should be applied otherwise than for some one or more of the purposes in the preceding covenant stated, for which, as therein stated, the Chicago Company may issue bonds. Until all the stock trust certificates shall be paid the San Francisco Company will not sanction or permit the sale of the Chicago Company of the railways constituting its system, or of any essential part thereof; but, such covenant notwithstanding, the trustee, upon the happening of any default, might exercise in its absolute discretion the voting power on the stock of the Chicago Company held by it under the trust agreement for any purpose the trustee should deem expedient.

Article 8 provides that the trustee should not be under any obligation to take any action towards the execution or enforcement of the trust hereby created unless the holders of the stock trust certificates should furnish reasonable security and indemnity against such expense and liability; nor should the trustee be required to take notice of any default thereunder unless notified in writing of such default by the holders of at least 20 per cent. in amount of the stock trust certificates then outstanding, and reasonable security and indemnity supplied; nor should this provision affect any discretion given to the trustee to determine whether or not the trustee would take action in respect to such default or to take action without such request.

Article 9 provides for the acceptance by the trustee of the trust. It is provided that the trustee should, until it shall have received written notice to the contrary from the holders of 20 per cent. in amount of the stock trust certificates outstanding, for all the purposes of the trust agreement, assume that the Chicago Company is not in default, that no receiver has been appointed of the Chicago Company, that the San Francisco Company is not in default under the trust agreement, and that none of the events denominated "events of default" had happened.

Article 10 provides that no holder of any stock trust certificate should have the right to institute any suit, action, or proceeding at

law or in equity upon or in respect to this trust agreement, or for the
execution of any trust or power thereof, or for any other remedy under
or upon this trust agreement, save subject to the provisions of section
13, article 6 thereof, nor unless the holders of 20 per cent. in amount
of the stock trust certificates then outstanding should have previously
given to the trustee written notice of any existing default and of the
continuance thereof as therein provided, nor unless the holders of 20
per cent. in amount of the stock trust certificates then outstanding
should have made written request upon the trustee and should have
afforded it a reasonable opportunity to proceed itself to exercise the
powers therein granted or to institute such action, suit, or proceeding
in its own name after such right of action should accrue to the trustee,
nor unless such holder or holders should have offered to the trustee
security against the costs and expenses of the liabilities incurred, it
being intended that no one or more of the holders of the stock trust
certificates should have any right in any manner whatever to affect,
disturb, or prejudice the lien of the trust agreement by his or their
action, or to enforce any right thereunder except in the manner there-
in provided; but the foregoing provision is to protect the trustee, and
should not be considered to affect any discretion or power by any pro-
vision of the trust agreement given to the trustee to determine whether
or not it should take action in respect of any default without such no-
tice or request from stock trust certificate holders, or to affect any
other discretion or power given to the trustee.

Under this agreement the plaintiffs and other shareholders of the
Chicago & Eastern Illinois Railroad Company transferred their stock
to the trust company and received stock trust certificates, whereupon
the trust Company caused the stock to be transferred upon the books
of the Chicago Company in its own name and is now the holder of a
large majority of the stock of the Chicago Company. As between
these holders of the stock deposited under this agreement and the San
Francisco Company, the San Francisco Company became the owners
of the stock. The plaintiffs and their associates became the owners of
the obligations of the San Francisco Company to pay at a date named
$250 for each share of the stock of the Chicago Company, and became
obligated in the meantime to pay an amount equal to 10 per cent. of
the par value of the Chicago Company's stock per year. As long as
it continued to make such payments and none of the events designated
defaults in the agreement had occurred, it became entitled to receive
all dividends declared by the Chicago Company. The stock of the
Chicago Company was deposited with the trustee to secure perform-
ance of the obligations of the San Francisco Company to pay the
amounts that the San Francisco Company had agreed to pay. The San
Francisco Company purchased the stock and had become its owner sub-
ject to the trust, and entered into certain covenants with the trust com-
pany which for the protection of the trust property the trustee could
enforce; but the holders of the stock of the Chicago Company who
received these stock trust certificates were not directly parties to the
agreement and could acquire no rights under it, except those rights
which were reserved to them by its terms.

Not being parties to it, but having by their voluntary action con-

stituted the trustee their trustee for the protection and enforcement of their rights, it is quite clear that they could maintain no suit at law or in equity in relation to the trust property or to enforce the rights of the trustee under the agreement, except after a request to the trustee to enforce such rights and a refusal of the trustee to comply with that request. But as to the conditions upon which they were entitled to request the trustee to enforce the trust agreement it seems to me that they were clearly bound by the terms of the trust agreement itself, and in the absence of fraud or collusion their right to insist upon default in the performance of any of the obligations imposed upon the San Francisco Company or upon the Chicago Company must be governed by the instrument itself, by the terms of which they were bound when they entered into the agreement and delivered their stock to the San Francisco Company or to the trust company under the agreement, and under which they had actually sold their stock to the San Francisco Company. There is no justification for a suspicion that the trust company has not acted in entire good faith in carrying out the wishes of a vast majority of the holders of these stock trust certificates. The agreement contains provisions regulating in detail the terms and conditions upon which the trustee can be required to enforce the agreement; it being entirely clear that it was the understanding of all the parties that, until at least 20 per cent. of the stock trust certificates then outstanding should join in a request to the trustee to enforce the agreement, it was under no obligation to take any action for that purpose.

The trustee became the record owner of the stock, and upon that stock the trustee had the right to vote. It obligated itself to give that right by power of attorney or proxy to the San Francisco Company; but the power thus given to the San Francisco Company was not to be used to accomplish certain results specified. But there was nothing in this agreement that restricted the power of the trustee, if it was considered for the benefit of the stock trust certificate holders, to vote to accomplish any of those purposes. There is no provision in this agreement that prohibits the trustee as the owner of the legal title of the stock from voting on such stock in any way that it considered to be to the advantage of the trust for which it is trustee, and when there was presented to the trustee a question as to whether or not the trust company would revoke its proxy or power of attorney, or whether it would take into its hands the management of the property because of a proposed violation of this covenant, the agreement in perfectly plain terms provided that there should be no obligation upon the trustee to enforce the provision of the agreement except upon the request in writing of 20 per cent. of the outstanding stock trust certificate holders.

The complaint seems to be based upon the existence of some trust relation between the San Francisco Company and these certificate holders; but it seems to me that the agreement will be searched in vain for the slightest trust obligation that exists, either as between the Trust Company and the San Francisco Company, or the holders of the stock trust certificates and the San Francisco Company. The allegations of the complaint that there is an obligation that the Chicago Company should not issue any securities except for the purposes nam-

ed is expressly negatived by the agreement itself. The Chicago Company was not a party to it, and there is no provision in it that the Chicago Company should not exercise any of its corporate franchises not prohibited by law. The San Francisco Company agreed that in pursuance of its control of the Chicago Company, by virtue of any power of attorney or proxy that it might receive from the trustee, it would not cause such securities to be issued. By section 3, article 5, it is provided that the railroad company should have the right, not being in default, to vote upon all shares of stock of the Chicago Company held by the trustee for the full performance by the Chicago Company of all its corporate duties and the maintenance of its corporate authority and franchises, and for every other purpose not contrary to the covenants or guaranties on the part of the railroad set forth in article 7 thereof. The provisions of article 7 are all obligations imposed upon the San Francisco Company, and the clause limiting the objects for which the stocks, bonds, or certificates of indebtedness of the Chicago Company are to be issued is a covenant on behalf of the railroad company that it will not sanction or permit the issue or use of any stocks, bonds, or certificates of indebtedness except for certain purposes therein named.

The original plaintiffs, Kissel and Kaumer, were the owners of these stock trust certificates of the par value of $1,377,000, which was something less than 8 per cent. of the total amount of outstanding certificates. The San Francisco Company under this trust agreement had received a proxy to vote upon the stock held by the trust company, and had elected directors and officers of the Eastern Illinois Company under its control and identified with the San Francisco Company. There was also a corporation known as the "St. Louis, Memphis & Southeastern Railroad Company," the stock of which was also owned by the San Francisco Company, and which it also controlled. The three companies, therefore, the San Francisco Company, the Southeastern Company, and the Eastern Illinois Company, were substantially controlled by those in control of the San Francisco Company.

That being the situation, the persons in control of these three railroad companies devised this agreement that has been set aside, which has been called a "traffic agreement." I will assume, without deciding that this traffic agreement violated the spirit, if not the letter, of the trust agreement, and imposed an obligation upon the Chicago Company which the San Francisco Company had agreed that it would not impose. I will also assume that this agreement, until actually ratified by the stockholders of the three companies, was voidable by either of the corporations who were parties to it, and particularly by the Eastern Illinois Company, which appears to have been the most responsible of the three and to have apparently received less benefit from the agreement than either of the others. This traffic agreement was then presented to the stockholders of the various companies for their action in relation to it. I will also assume that the Colonial Trust Company, who was the owner of substantially all of the stock of the Eastern Illinois Company, could have repudiated the agreement and refused to vote the stock held by it to ratify it, and upon the refusal of the stockholders to ratify the agreement it would have been void and of no effect.

The original plaintiffs, owning something less than 8 per cent. of the outstanding stock trust certificates, notified the trust company that this agreement was in violation of the trust agreement, and insisted that the trust company should refuse to vote the stock held by it in trust to ratify the agreement, and should take measures to prevent the agreement from being executed or ratified. They failed, however, to induce the holders of 20 per cent. of the outstanding stock trust certificates to join with them, and as under the agreement no holder or holders of stock trust certificates, unless they held 20 per cent. of those outstanding, could require the trustee to enforce the agreement or compel the trustee to take any action under it, the trustee refused to proceed. The trustee, therefore, had full knowledge of the situation that an agreement had been executed by the officers of the Eastern Illinois Company, which it was claimed by a substantial number of stock certificate holders was in violation of the trust agreement, and that those certificate holders insisted that the agreement should not be ratified.

It is clear that this agreement was not ultra vires. All of the parties to the agreement had power to make it, and the question presented to the directors of these three companies, and subsequently to the stockholders, when asked to ratify the contract, was whether the contract was for the interest of the company that they represented. The San Francisco Company had agreed with the trust company that it would not "sanction or permit" the imposition of any obligation upon the Eastern Illinois Company except for certain specified purposes. It proposed to authorize the Eastern Illinois Company to execute a contract which did impose an obligation upon that company; and it asked the corporation with whom it had made this agreement, who held substantially all of the stock of the company, to ratify and approve the agreement. The stock trust certificates contained certain provisions which each holder of them would be entitled to enforce; but as to the details of the management of the road pending the creation of the trust, the obligations which were to be imposed upon the Eastern Illinois Company, or which the board of directors of that company should have the right to impose upon it, the method by which the trust company, as the owner of the stock, should vote upon the shares held by it, or the purposes for which the proceeds of any obligations of that company were to be used, was right to be determined by the trust company, acting for the benefit of all the holders of the stock trust certificates. The parties to the trust agreement could waive any stipulation in the contract not included within the obligations of the San Francisco Company to the holders of the stock trust certificates. Instead of attempting to vote under its proxy or power of attorney to ratify this contract, the San Francisco Company applied to the trust company for a proxy to vote upon the shares of stock held by the trust company to ratify this agreement. There was no secrecy, fraud, or deceit about this transaction. The trust company understood perfectly well what it was doing. The original plaintiffs had protested against such action on behalf of the trust company, and insisted upon it that the trust company should refuse to vote to ratify the agreement; but the trustee, considering it, as we must assume, for the benefit of its cestuis que trust-

ents, and for the benefit of the Eastern Illinois Company, issued its proxy to certain persons named to vote at a meeting of the shareholders of the Eastern Illinois Company to ratify the traffic agreement. Such action was had, the stockholders of all three companies ratified it, and it became thereby a valid contract between the three companies.

Immediately after the ratification of this contract a large number of bonds of the Southeastern Company were issued, based upon the rights that had accrued to the Southeastern Company under this ratified agreement, which had become a valid contract upon its ratification by the stockholders of the three companies who were parties to it. These bonds, which were expressly secured by the advantages which accrued to the Southeastern Company by this ratified contract, were delivered for a valuable consideration to bondholders, who received them relying upon the rights secured to the Southeastern Company by this contract. These bonds were actually issued, as I understand the record, before the commencement of this suit. The original plaintiffs then, as the owners of less than 8 per cent. of the stock trust certificates, commenced this action to have that contract declared void. The trustee for the bonds issued by the Southeastern Company was made a party to the action, and it is alleged that that trustee had notice of this claim made by the plaintiffs prior to the issuance of those bonds. It is insisted by this trustee that the rights of the bondholders that it represents could not be affected by the subsequent action of the minority holders of the stock trust certificates disapproving of the action of their trustee in voting stock held by it to ratify this contract. But the holders of the bonds of the Southeastern Company are not parties to the record, they had no opportunity of being heard before their rights to have this contract enforced for their benefit was destroyed, and those substantial rights that have accrued to these bondholders have been swept away without giving them their day in court or an opportunity to be heard.

But, beyond this objection, it seems to me that the court had no power to declare this contract void at the suit of the minority holders of the stock trust certificates after it had been ratified, when, so far as appears, a very large majority insists that the contract is for the advantage of the Eastern Illinois Company and wish it to remain as a binding contract. As before stated, the contract was voidable, and not void. It became a binding contract upon its ratification by the shareholders of the three corporations who were parties to it. A large majority of the stock of one of the corporations was held in trust for certain stock trust certificate holders, and their trustee voted to ratify the agreement. A majority of the holders of the trust stock certificates have certainly by acquiescence ratified the action of their trustee in ratifying the agreement and have never in any way elected to disaffirm that act or to repudiate the action of their trustee, and, as before stated, so far as appears, now insist that the ratification of the agreement was an essential benefit to the company, the stock of which was held in trust for them, and desire that it should be ratified and not repudiated or rescinded. There is no charge that the Colonial Trust Company acted in collusion with the San Francisco Company or any one else in ratifying

this contract; that it did not act in entire good faith and considered it for the interest of its cestuis que trustents that the contract should be ratified. There is no element of fraud or deceit, and so far as I can see the question is one simply of a disagreement between a minority and majority of those interested in this stock, by which the minority seeks to control the majority and to upset an arrangement which has been made by the majority, and which, so far as appears is entirely satisfactory to it, and by this action repudiate an agreement in which other parties have in good faith, relying upon its terms, acquired a vested interest, without making such persons parties to the action.

Since the decision of the Court of Appeals in Continental Ins. Co. v. N. Y. & H. R. R. Co., 187 N. Y. 225, 79 N. E. 1026, it is not necessary to discuss the question as to whether minority stockholders have a right to a judgment reversing the action of the majority as to a matter about which there is a disagreement, which is not ultra vires of the corporation, and where no fraud is alleged or proved. The crucial point in this case is that the trustee, acting for all the certificate holders, has deliberately ratified this agreement; that it acted in good faith in so doing; that a majority of the certificate holders have raised no objection to the action of their trustee; and that third parties, relying upon the existence of this contract, have acquired substantial rights thereunder. Under those circumstances, it seems to me that the court will not, at the request of a minority of the certificate holders, inquire as to whether the majority or minority are right as a question of policy, or allow by its judgment the action of the minority to control the majority, merely because of a dispute as to a question of policy in relation to an act which is clearly within the power of the corporation and which has been exercised by it.

I am also inclined to concur with the Presiding Justice in the conclusion, arrived at by him, that, if this traffic agreement imposed upon the Chicago Company an obligation in excess of that contemplated by the trust agreement, the proper relief would be for the Chicago Company to attack such an agreement when it was sought to be enforced as against it, and that an action to set aside the agreement by the holders of the trust stock certificates before a default by the San Francisco Company cannot be maintained.

For these reasons, I think the action cannot be maintained and that the judgment should therefore be reversed, and the complaint dismissed, with costs.

McLAUGHLIN, J., concurs.

PATTERSON, P. J. (concurring). It is unnecessary to restate the facts of this case. They sufficiently appear in the opinions of my associates.

The principal subject to be considered is the relation of the San Francisco Company and the former owners of the preferred and common stock of the Chicago & Eastern Illinois Company, sold by them to the San Francisco Company, to and with the Colonial Trust Company. As I understand it, the holders of the stock made an absolute

sale to the San Francisco Company. They parted with title and with possession, and retained no proprietary right whatever in the stock. The only evidence we have of what contract or arrangement existed between such holders and the San Francisco Company is contained in the certificates issued by the San Francisco Company and the trust agreement. When the stock was sold, the stockholders changed their position to that of holders of the certificates of the San Francisco Company, and whatever rights the plaintiffs, or others similarly situated, have, are derived from or attributable to the stipulations of the certificates and the trust agreement.

The stock was deposited by the San Francisco Company, as purchaser and owner, with the Colonial Trust Company under the terms of the trust agreement. The Colonial Trust Company did not become the owner of the stock. It acquired no power or right in the administration of the Chicago & Eastern Railroad, or to do anything connected with such contracts as that road might make in the course of administration. The voting power on the stock was expressly given to the San Francisco Company. The Colonial Trust Company did not become the real, but only the nominal, stockholder. Title was placed in it only for the purpose of protecting the holders of the certificates of the San Francisco Company, and the provision was made in the trust agreement for giving proxies by the trust company to the San Francisco Company, or to those who might represent the interests of the San Francisco Company in the Chicago Company. The Colonial Trust Company had nothing whatever to do with anything connected with the holding of the stock, except to furnish the instrument necessary to enable the San Francisco Company to exercise the right to vote, inasmuch as the record holder of stock would be entitled otherwise to vote upon it, and the proxies of the trust company were merely auxiliary to the right of the San Francisco Company to vote as it chose. Hence I do not agree with Mr. Justice INGRAHAM on the point that the Colonial Trust Company was the owner of the stock in such a way as to exercise a control or power over the right to vote, which was expressly lodged in the San Francisco Company by the terms of the trust agreement. I think that the San Francisco Company had the complete control of the Chicago Company, the intention being that the Chicago Company should be connected with it in the management and control of what might be called a combined line of road, and that the Colonial Trust Company had no duty whatever to perform, except to give proxies as required, and, of course, to see that the provisions of the trust agreement were duly performed. When that trust agreement was made, the whole of the proprietary right in the road of the Chicago Company was virtually vested in the San Francisco Company. It had an absolute right to do whatever it pleased with the net revenues and with the product of the operation of the Chicago road, except that it could do nothing that would be an infraction of the trust agreement or of the provisions of the certificates issued by it.

The right of the San Francisco Company to make any disposition it pleased of the net income derived from the operation of the Chicago road, and to bind that company by contracts connected with operation,

was complete. It was competent to the San Francisco Company, in the control of the Chicago Company, to make a traffic agreement with itself or with any other company that it deemed to be for its benefit, as the real owner of the Chicago stock. Therefore the San Francisco Company and the Chicago Company, under its control, had the right to make a contract and to perform it, so long as there is no act done in violation of the rights of the holders of the certificates. They made a contract which on its face is one of traffic and nothing else. The motive which impelled the San Francisco Company to make that contract is of no consequence, so long as the Chicago & Eastern Illinois Company remains in its control and ownership.

Here is a traffic agreement, valid in every respect, except in so far as by its terms there may be carried over an obligation of the Chicago Company to pay to the Southwestern Company after default made by the San Francisco Company of its obligations under the trust agreement. As I regard it, the San Francisco Company has the right until default to use the revenues of the Chicago Company for any legitimate purpose. We cannot say that the traffic agreement is wholly void, as was determined by the court below. It is not; but it will not be enforceable against the Chicago Company or the holders of the certificates after a default that may accrue. The only infirmity in the traffic agreement is that there may be claimed under it a liability of the Chicago Company after default is made. I agree that such a stipulation is unenforceable against the holders of the certificates; but, that being so, such holders have no cause of action against the San Francisco Company or the Chicago Company, until some act is done or threatened, or an attempt is made to impose upon them an obligation which cannot be placed upon them or the Chicago Company after default. This is not a case of a cloud upon property or title, which a court of equity can remove. It is simply a case where there is only potentiality of detriment to the holders of the certificates in circumstances which may never arise, and it is nothing more and nothing less.

In that view of the case, an action in the nature of a bill quia timet will not lie, for such an action (assuming it may be brought as to instruments of the character here involved) is never entertained upon a mere possibility, but must be founded upon an actually threatened invasion of the rights of plaintiffs. When default occurs, and an attempt is made to enforce the traffic agreement against the Chicago Company, it will be time to bring or resist an action. These plaintiffs having, as I think, no present claim to relief, the court should not enjoin what may be done lawfully under the traffic agreement.

If I am right in this view of the case, the consideration of other matters connected with it is unnecessary; but I should add that, if I am in error in my understanding of the rights of the parties, I think the complaint should not be dismissed because of a failure on the part of the plaintiffs to comply with the provisions contained in the trust agreement respecting the preliminaries to the institution of an action against the Colonial Trust Company. Those provisions were made for the benefit of that company, and might be waived; and by the at-

titude which it took upon the trial I think they were waived. A court of equity, having jurisdiction of the person and of the subject-matter, awards relief according to the rights of the parties as they appear at the close of the proofs; and, if the traffic agreement can on these proofs be set aside in toto, I see no reason why it may not be done in this action.

SCOTT, J. (dissenting). The transaction by which the St. Louis & San Francisco Railroad Company (called for brevity the "Frisco Company") acquired the stock and consequent control of the Chicago & Eastern Illinois Railroad Company (called for brevity the "Chicago Company") was one between the Frisco Company and the stockholders of the Chicago Company as individuals. It was a contract of purchase, by which the actual and beneficial title to the stock passed to the Frisco Company. Since, however, the purchase price was not to be paid until 1942, and certain sums in lieu of dividends on the stock were to be paid meanwhile, it was necessary that security should be afforded to the vendors of the stock for the fulfillment of its obligations by the vendee, the Frisco Company. The contract of purchase, being in the form of what is called a "stock trust certificate," issued to the owners of the stock of the Chicago Company in exchange for the stock sold by them, is incorporated into the trust agreement between the Frisco Company and the Colonial Trust Company, it being recited that:

"This stock trust certificate is issued under a trust agreement, dated October 1, 1902, between the railroad company [meaning the Frisco Company] and the Colonial Trust Company, trustee, to which this stock trust certificate is subject, and to which reference is made for its contents, for the nature and extent of the security, for the rights of the holders of stock trust certificates, and for the terms and conditions on which the stock trust certificates may be issued and are secured."

Thus the trust agreement between the Frisco Company and the Colonial Trust Company is read into and becomes a part of the contract between the Frisco Company and the individuals from whom it purchased shares of stock of the Chicago Company. A reference to that trust agreement discloses the nature and extent of the ownership by the trust company of the Chicago Company's stock. The trust agreement recites that the railroad company (meaning the Frisco Company) had determined to secure said stock trust certificates by the deposit and pledge with the Colonial Trust Company, the trustee, of all of the stock of the Chicago Company which it (the Frisco Company) might acquire. It is further recited that, in order to secure its obligations and agreements to and with the holders of the stock trust certificates (the vendors of the stock of the Chicago Company), the Frisco Company had and did "assign, transfer, pledge, and set over unto the trustee (the Colonial Trust Company), its successors in the trust, and its or their assigns, all of the shares of stock of the Chicago Company which the Frisco Company may have acquired or may acquire," in trust, nevertheless, for the common and equal use, benefit, and security of all and singular the person or persons, firm or firms, bodies politic or corporate, who shall from time to time be holders of the stock trust certificates.

The relations to each other of the former stockholders of the Chicago Company and the Frisco Company and the Colonial Trust Company are thus made exceedingly plain. The stockholders of the Chicago Company had sold absolutely their stock to the Frisco Company, receiving in return therefor stock trust certificates issued by the Frisco Company. The Frisco Company, having become the owner of the stock of the Chicago Company, had deposited that stock with the Colonial Trust Company as a pledge and security for the performance of the undertakings and agreements under which the stock had been purchased. The Colonial Trust Company held the stock of the Chicago Company merely as trustee under the trust agreement, and, while it held the legal title to the stock as trustee, it had no beneficial interest therein or title thereto, and no right or authority to deal with the stock, or to exercise any of the rights of ownership therein, except as it was especially authorized to do by the trust agreement. In short, the Frisco Company had purchased the stock of the Chicago Company, and had mortgaged the stock as security for its fulfillment of the contract of purchase, making that mortgage effectual by a deposit of the stock with the trust company, retaining in itself the beneficial ownership of the stock, but vesting the naked legal title in the trust company as trustee. That the Frisco Company retained the beneficial title to and interest in the stock is illustrated by the clauses known as sections 2 and 3 of article 5 of the trust agreement.

By section 1 of article 5 it is provided that the trustee shall cause to be transferred into its own name, or into the names of its nominee or nominees, all shares of stock deposited with it under the trust agreement. Obviously it was necessary that this should be done in order to make the pledge effectual, and to put the trustee in a position to act, if necessary, for the protection of the trust certificate holders. But by section 2 it is provided that unless one or more of the events specified in section 2 of article 6 of the trust agreement, and therein denominated the "events of default," shall happen and be continuing, the trustee shall not collect or be entitled to collect, except upon the request of the Frisco Company, any of the dividends from time to time declared in respect of the stock of the Chicago Company held by the trustee under the trust agreement, and the trustee shall at once pay over any dividends collected to the Frisco Company. By section 3 the Frisco Company is expressly given the right, not being in default under the stock trust certificates or under the trust agreement, to vote upon all shares of the stock of the Chicago Company at any time held by the trustee for the election of directors or for any of the other purposes for which stockholders may vote, except for purpose contrary to the covenants and guaranties on the part of the Frisco Company set forth in article 7 of the trust agreement, and the trustee is required, on demand of the Frisco Company, to execute and deliver to the Frisco Company, or its nominees, suitable power of attorney to vote on such shares. Thus the Frisco Company has reserved to itself, until default, the sole beneficial use of and interest in the pledged stock, to wit, the receipt of the dividends and the power of voting thereon.

The "events of default" referred to in the preceding section are enumerated in section 2 of article 6 of the trust agreement, and con-

sist of failure to pay the principal or any dividend due on the stock trust certificates; the appointment of a permanent receiver of the Chicago Company; failure to pay the principal or interest upon any mortgage of the Chicago Company; failure to pay rent upon any line of railway leased to the Chicago Company, or default in the payment, observance, or performance of any other of the covenants, conditions, or agreements on the part of the Frisco Company in the stock trust certificates, or in the trust agreement, if such default shall have continued for six months after notice thereof shall have been given by the trustee to the president of the Frisco Company. It is only if and when some one or more of the foregoing events of default shall happen, and during the continuance of such default, that the trustee may vote upon the shares of stock held by it, or may refuse its proxy so to vote to the Frisco Company. Until such default the Frisco Company was to remain a purely passive trustee, and could neither itself vote upon the stock held by it in pledge, nor refuse to execute and deliver to the Frisco Company a proxy to enable that company to vote thereon. Up to the time that the Frisco Company, by virtue of its beneficial interest in the stock of the Chicago Company, voted to enter into the traffic agreement which is the subject of controversy in this action, no event of default had occurred, and consequently the trust company had acquired neither the right nor duty to itself to vote upon the stock or to refuse its proxy to the Frisco Company. No default had as yet been made in any of the payments specified in the enumeration of "events of default," and, assuming that the execution of the traffic agreement was a violation of the trust agreement, it was one of those defaults which conferred upon the trust company no right to vote or to withhold its proxy until the default had continued for six months.

Even if it be assumed, which I by no means concede, that the trustee had any power or authority, as holder of the legal title of the stock of the Chicago Company, to assent to a modification or violation of the trust agreement, such assent cannot be presumed from the fact that it gave its proxy to the Frisco Company to vote upon the proposition to execute a traffic agreement, when it was obliged by the very terms upon which it held the stock to give such a proxy upon demand. But it seems to me that it was quite beyond the power of the trust company, either by its own vote, if it ever acquired the right to vote, or by executing a proxy to the Frisco Company to vote upon the pledged stock, to validly consent to the imposition upon the property and franchises of the Chicago Company, represented by the pledged stock, of obligations which the Frisco Company as pledgors had covenanted should not be imposed. The trust agreement, which specified, defined, and limited the power and duties of the trust company, as trustee, was not only an agreement between the Frisco Company and the trust company, the signatories to it, but by the very terms of the stock trust certificates had been read into and made a part of the contract between the Frisco Company and the individuals holding the stock trust certificates. Nowhere in the trust agreement is there to be found any authority given to the trust company, either expressly or by implication, to participate in or to consent to a violation of these restrictive covenants which were

designed and intended to preserve the security given to the holders of the stock trust certificates. The trust company was made depository and trustee of the stock in order to preserve the security to the holders of the stock trust certificates, and not to destroy or lessen it, and was powerless to consent to any departure from or violation of the trust agreement in which it had no beneficial interest.

Article 7 of the trust agreement contains covenants specifying with great particularity the things which the Frisco Company will and will not do in the management of the Chicago Company  Under these covenants the Frisco Company, as owner and pledgor of the stock, agrees that it will not suffer or permit the issue of stock, bonds, or certificates of indebtedness, or the proceeds thereof, except for certain specified purposes, all of which have for their object the improvement and preservation of the property of the Chicago Company, that property which lies back of and is represented by the pledged stock; and it is obvious that a wasting of the property and assets of the company would be tantamount to a wasting of the stock representing that property and which constitutes the sole security of the holders of the stock trust certificates. The so-called traffic agreement certainly involves, potentially at least, the pledging of the assets and credit of the Chicago Company for the benefit of the Frisco Company and the St. Louis & Southeastern Company, and for a purpose not contemplated by the trust agreement. The restrictive (seventh) article of the trust agreement specifies what the Frisco Company will not sanction nor permit "until all of the stock trust certificates shall be paid." This article forbids the issue or use of any stocks or bonds or certificates of indebtedness of the Chicago Company, or the proceeds thereof, or any use of its property or assets, or the proceeds thereof, except for certain specified purposes, all of which are such as will be beneficial to or in the interest of the Chicago Company, and thus by fair inference and intendment the use of the credit or assets of the Chicago Company for the benefit of any other corporation is expressly forbidden.

The court below has found, and the evidence amply sustains the finding, that the traffic agreement, which is the subject of attack in this action, was not made in good faith for the benefit of the Chicago Company, but for the benefit of the Frisco Company and of the Southeastern Company, which it controlled and owned. The evidence to support this conclusion is furnished by the defendants' own officers. The Southeastern road was burdened by mortgages, the interest of which it was not as yet able to earn. As to a portion of this debt the Frisco Company was directly liable, as guarantor, for the payment of the interest, and as to the remainder it was virtually bound to provide for the payment of the interest, because of its ownership of the stock of the road. This burden became onerous, and various successive plans were devised for refunding the indebtedness. One after another these plans failed, either because it was found to be impossible to float the securities proposed to be issued or because the holders of the outstanding Southeastern bonds refused to accept the securities proposed to be given them in exchange for their securities. Finally it was proposed that the new securities to be issued should be guaranteed in some way by the Chica-

go Company. A frank and outspoken guaranty was, of course, impossible under the terms of the trust agreement, and thereupon the plan of a traffic agreement was devised, under which, while the Chicago Company would not in terms guarantee the new bonds, it would guarantee to the Southeastern road a certain and sufficient income to meet its interest and obligations upon the new issue of bonds.

That this was the purpose of the traffic agreement appears clearly upon its face. It recites the intention of the Southeastern Company to refund its outstanding first mortgage bonds by the issue of $16,000,000 five-year 4½ per cent. gold bonds, bearing an interest obligation of $720,000 per annum. It further recites that the entire capital stock of the Southeastern road (owned by the Frisco Company) is deposited with a trust company to secure notes of the Frisco Company, aggregating approximately $3,700,000, which has been advanced by the Frisco Company and expended in the construction of the railroad lines of the Southeastern Company, and that the Frisco Company proposed to return these notes and issue new gold notes for $5,000,000, the annual interest charge on which would amount to $250,000. Thus the annual interest upon the proposed new issues would amount to $970,000. The Chicago Company and the Frisco Company "collectively" agreed to interchange with the Southeastern Company an amount of traffic which would aggregate to the Southeastern Company a semiannual net revenue of $485,000 "over and above expenses of maintaining, operating, and repairs and renewals of and taxes upon the railroad property of the Southeastern Company; and the Southeastern Company in turn undertook that this net revenue of $970,000 per annum should be applied to the payment of the interest upon the proposed issue of gold notes of the Southeastern Company, and to the payment of $250,000 per annum as dividends upon the stock of that company owned by the Frisco Company, and pledged for its proposed issue of new notes. The net result of this agreement was that the Chicago Company became obligated to issue to the Southeastern Company a net annual income equivalent to the interest upon the new bonds to be issued by that company, and the new notes to be issued by the Frisco Company.

It is true that this was proposed to be done by the interchange of traffic; but, if it should prove to be impossible thus to provide it, the Chicago Company would undoubtedly be liable, as for damages, for so much of the net income as it could not provide by interchange of traffic. It is true, also, that the Frisco Company was also bound; but its failure to furnish income would not relieve the Chicago Company from its obligations. I have no doubt that the Frisco Company, being the owner of all three companies, could arrange an interchange of traffic between them as it pleased, and, if it saw fit, could agree with itself to make such an interchange in the future. So long as it observed its contract obligations with the stock certificate holders of the Chicago road, they could not complain, and if the traffic agreement was so limited as to the time of its duration that it would terminate, as to any obligation imposed upon the Chicago Company, if and when the Frisco Company defaulted in its obligations to the stock certificate holders, I should find it free from legal objection. Its vice consists

in the fact that it is not so limited. By its terms it is to continue until the 1st day of June, 1909, "and thereafter so long as any of said five-year 4½ per cent. gold bonds or of said 2½-year 5 per cent. gold notes shall remain outstanding and unpaid." This is wholly indefinite, for while by the terms of the agreement the bonds and notes may not be formally extended, there is nothing to prevent the indefinite postponement of their actual payment with the acquiescence of their holders.

The effect of the agreement, therefore, is to impose upon the Chicago Company an obligation to insure to the Southeastern Company a net annual income of $970,000 with which to pay the interest on its bonds and a dividend upon its stock; and this obligation may extend beyond the time when, under the trust agreement, the stock certificate holders will become entitled to resume the ownership of the stock of the Chicago Company. The effect of this would be to return them the ownership of the Chicago Company burdened with an onerous obligation imposed for a purpose foreign to the interests of the company. Against this contingency they are entitled to be protected by a court of equity. It is not, in my opinion, a sufficient answer to say that the holders of the stock trust certificates are only potentially injured, that the contingency upon which the traffic agreement will become oppressive may never occur, and that it will be time enough then to attack its validity.

The trust certificates are property, and can be bought and sold. The existence of such a cloud upon the security upon which their value depends must affect that value in the hands of their holders, and the question whether that cloud indicates a real menace should not be left to future determination. As has been said, if the agreement were limited to the time during which the Frisco Company continues to own all the stock of the Chicago Company, its validity might be affirmed; but it is not so limited, and we have no power to so limit it. To do so would be to make a new contract for the parties, and one which they would not have made because it would not have answered the required purpose. The traffic agreement must stand or fall as it is, and as it is I cannot resist the conclusion that it is invalid and contrary to the terms of the trust agreement.

I am therefore in favor of an affirmance of the judgment, with costs.

CLARKE, J. (dissenting). Defendant Chicago & Eastern Illinois Railroad Company owns and has for many years owned certain railroads in the states of Illinois and Indiana. For a considerable number of years prior to October 1, 1902, these railroads had been successfully operated as an independent system. Its net earnings were steadily increasing, and for the fiscal year ending June 30, 1902, its surplus, after payment of operating expenses, taxes, rental, interest charges, and dividends on its preferred stock, amounted to more than 14 per cent. on its common stock. Dividends on its outstanding common stock were declared as follows: 1898, 2½ per cent.; 1899, 3½ per cent.; 1900, 4½ per cent.; 1901, 5½ per cent.; 1902, 6 per cent. It had accumulated in its treasury a surplus amounting to $10,353,448.08 in quick assets. These were free assets, subject to no mortgage or trust lien. In the

year 1902 the defendant St. Louis & San Francisco Railroad Company operated and still operates a large system of railroads lying west of the Mississippi river, and extending across the Mississippi river at Memphis to Birmingham, Ala. It acquired a large portion of this system by issuing its own obligations in exchange for the stock or securities of the acquired properties. In the year ending June 30, 1904, the capitalization of the Frisco System, including the stocks, bonds, notes, trust certificates, and bonded obligations, amounted to over $200,000,000, and the surplus income applicable to dividends amounted to less than 1 per cent. of that sum.

In August, 1902, the Frisco Company issued an offer to the stockholders of the Eastern Illinois Company to acquire the shares, common and preferred, thereof. It desired to purchase the Eastern Illinois without any present payment for the stock thereof. It promised to pay in 1942, or upon any dividend day upon 30 days' notice, $250 a share for the common stock and to pay $10 per year dividends and $150 a share for the preferred stock and $6 a year dividend. The stock, when deposited, was put in the name of the trust company, which became the owner thereof upon the books of the Eastern Illinois, but which held such stock, under the terms of the trust agreement, as security to the former owners, the sellers, to whom were issued trust stock certificates, and for the benefit of the Frisco Railroad, who, by the proxy which the trust company agreed to deliver to it, exercised full voting power therein and so controlled the railroad. But this power of control was limited, by the terms of the agreement and for the benefit of the old stockholders, by providing that the Eastern Illinois should be continued and kept up as a going concern, with the exercise of all of its corporate powers, rights, privileges, and uses, and by the provision that the voting power given by the proxy issued by the holder of record, the trust company, to the Frisco Company, should not be used to issue stocks, bonds, or certificates of indebtedness for any other purpose than the legitimate purposes of the preservation, improvement, and betterment of the Eastern Illinois, and that the trust estates which stood upon the Eastern Illinois' books on the 15th of August, 1902, amounting to upwards of $10,000,000, should only be used for the same purposes— that is, the payment of debts and obligations and for the improvement and betterment of the Eastern Illinois as a complete corporate individuality and a going concern; and this because, upon any default of 30 days in the payment of dividends or a default at the end of 40 years in the payment of the amount agreed to be paid, the stock of the Eastern Illinois was to be given back to the original sellers in place of their trust stock certificates, and so, of course, the road surrendered to them, and by the terms of the offer of deposit and by the terms of the agreement itself the certificate holders were in express terms made parties to that agreement and were possessed of the rights, privileges, and beneficial interests therein provided for. The object of the agreement was to give to the Frisco road the benefit of the earnings of the Eastern Illinois above the amount necessary to pay its operating expenses, fixed obligations, and the dividends agreed to be paid to the certificate holders; but as security for the payment of those dividends

and the keeping of the contract the road was to be kept intact and the new management made possible by the ownership of the stock was limited by the trust agreement in the things which it could do. This, then, was more than a conditional sale, where possession of the thing itself—that is, the stock—was to be given back in case of default. It was a controlling agreement that, while possession of the railroad, evidenced by the stock, the thing sold or agreed to be sold, was in the hands of the conditional purchaser, it should be managed, controlled, and preserved according to the prescribed conditions and within the prescribed limits of the trust agreement.

The defendant St. Louis Memphis & Southeastern Railroad Company, a Missouri corporation, hereafter called the "Southeastern Company," was organized on or about January 8, 1902, and has constructed and otherwise acquired certain railroads situated in the states of Missouri and Arkansas and lying west of the Mississippi river and south of St. Louis. On or about January 10, 1902, there were executed, with reference to the Southeastern Company, certain agreements, to wit: (a) A construction contract between the Southeastern Company and the Missouri & Southeastern Construction Company; (b) an agreement between the said construction company and the Frisco Company; (c) a traffic agreement providing for the interchange of traffic between the Frisco Company and the Southeastern Company; (d) a trackage agreement providing for certain trackage rights between the Frisco Company and the Southeastern Company; (e) the first mortgage of the Southeastern Company to the Old Colony Trust Company and John F. Shepley, as trustees, to secure a proposed issue of bonds of the Southeastern Company. Under this mortgage $9,188,500 bonds were issued and were outstanding on April 14, 1904. The foregoing papers were all dated the same day, were executed with reference to each other, and constituted a single plan or scheme for the construction or acquisition of the proposed railroads of the Southeastern Company. Thereafter, and prior to April 14, 1904, and pursuant to the said plan or scheme, certain of the proposed railroads of the Southeastern Company were constructed or acquired and operated under the supervision and management of the engineers and traffic managers of the Frisco Company. Pursuant to said plan or scheme, the Frisco Company, long prior to April 14, 1904, acquired all of the capital stock of the Southeastern Company at a price of about $32 per share in the collateral trust notes of the Frisco Company. For the purpose of said acquisition, the Frisco Company, prior to said date, issued about $4,000,000 of such collateral trust notes under an agreement with the Eastern Trust Company, dated November 1, 1902, of a somewhat similar nature to the stock trust agreement made between the Frisco Company and the Eastern Illinois. During the period of construction and prior to April 14, 1904, the earnings of the railroads of the Southeastern Company were credited to construction account, which account was in the control of the officers of the Frisco Company, and the expenses of said construction were paid by said officers. The said earnings of the Southeastern Company at no time during said period equaled its running expenses, and the cost of construction and completion of its said

railroad lines exceeded the amount realized from its stock, bonds, and other securities by more than $3,500,000, which sum was, prior to April 14, 1904, advanced by the Frisco Company for the purpose of such construction. On or about November 30, 1903, all of the railroads constructed or acquired, and to be constructed and acquired, and all of the appurtenant property of every description of the Southeastern Company, were leased to the Frisco Company for a term of 99 years. Under said lease the Frisco Company was entitled to the immediate possession and use of all railroads and other property of the Southeastern Company, and to receive all the rents, issues, and profits thereof, and was obligated to apply the net earnings of the leased properties to the taxes and interest on the bonds of the lessor, and thereafter to apply them in payment of dividends on the stock of the lessor; said stock being then owned by the Frisco Company itself. In substance and effect the organization of the Southeastern Company was merely a means devised by the Frisco Company to acquire a certain railroad route. The Frisco Company participated in the creation of the Southeastern Company, built and operated its road under the supervision of the Frisco Company's officers, absolutely controlled its traffic policy, owned all its stock, elected its directors and officers, and eventually leased its railroads and property to itself.

Shortly prior to December 18, 1902, the St. Louis & Gulf Railway Company, a Missouri corporation, hereafter called the "Gulf Company," was organized to construct, acquire, and operate, and has constructed and acquired, certain railroads and other property within the states of Missouri and Arkansas, lying south of the city of St. Louis. For the purpose of such construction and acquisition, the said Gulf Company executed its first mortgage to the St. Louis Union Trust Company, dated December 18, 1902, under which mortgage there were issued and outstanding on April 14, 1904, bonds of the par value of $5,852,000. Some time after the date of its organization, and in or about 1903, the entire capital stock of said Gulf Company was acquired by the Frisco Company, and the said Frisco Company guaranteed the principal and interest of the entire issue of said bonds. On or about June 1, 1904, all the railroads and property of the Gulf Company were conveyed to the Southeastern Company. For a considerable time prior to April 14, 1904, and ever since, the operation and traffic policies and the corporate policy and actions of the Gulf Company have been completely controlled by the Frisco Company, and the said Gulf Company has had no separate or independent action as distinct from the Frisco Company.

The railroad of the Southeastern Company connects physically with that of the Eastern Illinois Company at Thebes, Ill., and with that of the Frisco Company at Lindenwood, Mo., near St. Louis. Under trackage agreements with the Frisco Company, the Southeastern Company operates into St. Louis over the tracks of the Frisco Company, which tracks connect in St. Louis with the tracks of the Big Four System running from St. Louis to Pana, Ill., at which point the tracks of the Eastern Illinois Company physically connect with the said tracks of the Big Four System. Both the Frisco Company and the Eastern Il-

linois Company by trackage agreement have the right to operate fully all through traffic over the said tracks of the Big Four System between St. Louis, Mo., and Pana, Ill., for a period of 999 years. Prior to April 14, 1902, it became greatly to the interests of the Frisco Company to devise a means of refunding the various obligations and securities aforesaid created with reference to the properties of the Southeastern and Gulf Companies, and to devise a means of carrying said obligations which would be less burdensome to the Frisco Company. The earnings of the Southeastern and Gulf Companies were insufficient to meet their fixed charges, including their issues of bonds above mentioned, and the said bonds were selling below par. The said bonds of the Southeastern Company and Gulf Company were held to a very large extent by certain syndicates, some of which syndicates were about to expire by limitation in the spring and summer of 1904, on which expiration the said bonds were likely to become scattered. The collateral notes of the Frisco Company, issued for the purchase of the Southeastern Company's stock, were also largely held by one of said syndicates, and the Frisco Company had an option for the purchase or redemption of said collateral notes at 82½ per cent. of their face value, which expired on July 1, 1904.

Accordingly the Frisco Company attempted to put into execution certain plans for refunding the said obligations and securities. It first proposed to organize a new corporation to acquire a through line from Chicago to New Orleans. It was proposed that said corporation should take over the properties of the Eastern Illinois and Southeastern and Gulf Companies, and should construct the remaining railroad necessary to reach New Orleans. This was a large proposition, about $175,000,-000. This plan was abandoned for the time on the advice of the bankers who were to finance the plan to the effect that the securities could not be floated at that time. Thereafter the Frisco Company proposed a second plan, to the effect that the above-mentioned obligations and securities of the Southeastern and Gulf Companies should be purchased by the Eastern Illinois Company, and that the Eastern Illinois Company should issue its bonds for about $26,000,000 in payment therefor. Upon learning of said plan, the plaintiff Kissel and certain other large holders of the common stock trust certificates issued under the stock trust agreement, with reference to Eastern Illinois Company stock, protested, and the said plan was abandoned.

Thereafter the Frisco Company offered to the syndicates holding the Southeastern and Gulf debt to issue in exchange therefor bonds of the Frisco Company secured by a mortgage of said railroads and property of the Southeastern Company; but the said proposition was rejected by the syndicates as not satisfactory. They said they were satisfied with the securities they had, and did not want to exchange them unless they could get something better than they had; that they had practically the first mortgage on the St. Louis, Memphis & Gulf lines, and they had the Frisco collateral trust notes, and they practically had the Frisco as a guarantor of the bonds, because the Frisco owned all the stock that was underneath them, and they stated that they wanted something more, or they preferred to stay where they were, and refused

to accept the new scheme, unless the bonds and obligations to be issued were guaranteed by the Eastern Illinois Company. Thereafter, and, as appears conclusively from the evidence, for the sole purpose of refunding said Southeastern and Gulf debt, and of repaying to the Frisco Company the advances upon the construction account of $3,-500,000 which it had advanced, the Frisco Company devised and put in execution the plan under review in this case. Its basis was the so-called traffic agreement at bar. It did not have its inception in the operating or traffic departments of any of these railroads. It was not necessitated by any emergency in traffic conditions. It was not caused by any disruption of amicable relations, or any prospect thereof. The parties to it were all operated and conducted as one road under the same management. The Frisco road dominated and controlled each of the subsidiary companies. It nominated, elected, and kept in office all their directors and operating officers. The traffic had been and continued to be as it ordered and required, and there was absolutely nothing in the practical management of the railroads concerned which instigated or required this agreement. It was, from all of the evidence, and as evidenced upon the face thereof, purely a financial measure, dictated by the financial necessities of the situation, brought forward as the fourth of a series of plans to refund the outstanding obligations, the syndicates holding which were about to be dissolved, the members of which had demanded as a condition of their consent to a new refunding scheme the guaranty of the one successful and dividend-paying, well to do road in the combination, possessed of a handsome surplus, to wit, the Eastern Illinois.

It is impossible to read this record and to reach any other conclusion than the one just stated. It was not a traffic agreement, as called, but a financial device to procure a solvent guarantor for a refunding scheme for the benefit of the dominant interest, the Frisco road, and to enable it to extricate itself from the difficulties in the refunding of its debts and obligations. Indeed, counsel for the railroads unwittingly corroborates this view, for he says in his brief:

"With this substantial guaranty of income to the Southeastern Company, the then holders of the Southeastern securities were willing to part with their securities and to accept in lieu thereof a materially less amount of short-term securities."

I said that its character was evidenced upon the face of the agreement. It was dated April 14, 1904, was between the Frisco Company and the Eastern Illinois Company, as parties of the first part, and the Southeastern Company, as party of the second part. In other words, it was made by the Frisco Company with itself. It provides:

"Whereas, all lines of railroad and the appurtenant franchises, equipment, and property of the Southeastern Company are subject to a mortgage dated January 10, 1902, made to the Old Colony Trust Company and John F. Shepley, as trustees, to secure the first mortgage 4 per cent. gold bonds of the Southeastern Company of an issue limited to the aggregate amount of $13,-000,000, of which bonds to the amount of not exceeding $9,188,500 have been issued and are outstanding; and whereas, the Southeastern Company, for the purpose of refunding the said outstanding first mortgage bonds of the Southeastern Company and of completing its lines of railroad, and of refunding outstanding indebtedness incurred for the construction and completion thereof,

and for the acquisition of additional lines of railroad, proposes to execute a new mortgage to bear date June 1, 1904, and to issue thereunder 5-year 4½ per cent. gold bonds of the Southeastern Company aggregating in principal amount $16,000,000, of which the interest obligations of the Southeastern Company will aggregate $720,000 per year; and whereas, the entire capital stock of the Southeastern Company, amounting for par value to $12,500,000, is pledged and deposited with the Eastern Trust Company, as trustee under a certain trust agreement dated November 1, 1902, made by the Frisco Company to secure an issue of 4 per cent. collateral trust gold notes of the Frisco Company. in amounts aggregating approximately $3,700,000 over and above the bonded indebtedness of the Southeastern Company have been advanced by the Frisco Company and expended in the construction of the railroad lines of the Southeastern Company, and the Frisco Company proposes to retire said collateral gold notes and to partially reimburse its treasury for said advance to the Southeastern Company by the issue and sale of 2½-year 5 per cent. gold notes of the Frisco Company of an aggregate face amount of $5,000,000, under a trust agreement to bear date June 1, 1904, and the interest obligations on such new gold notes will amount to the sum of $250,000 per year—for a valuable consideration it is agreed as follows: * * * The parties of the first part jointly agree that they will collectively interchange with the railroad lines of the Southeastern Company a sufficient amount of traffic during the term of this agreement to produce, together with the local and other traffic of the Southeastern Company, an aggregate semiannual net revenue to the Southeastern Company of not less than $485,000 over and above all expenses of maintenance, operation, repairs, and renewals of, and taxes on, the railroad property of the Southeastern Company, said amount of net revenue being at least sufficient to provide for the interest on the entire proposed issue of said 5-year 4½ per cent. gold bonds of the Southeastern Company, and a dividend of $250,000 per year upon the capital stock of the Southeastern Company, pledged to secure said proposed issue of 2½-year 5 per cent. gold notes of the Frisco Company, and the Southeastern Company agrees that said net revenue will be applied semiannually to the payment of such interest and dividends as they accrue, and to the extent necessary to pay them in full. * * * This agreement shall be and remain in force from the 1st day of May, 1904, until the 1st day of June, 1909, and thereafter so long as any of said 5-year 4½ per cent. gold bonds or of said 2½-year 5 per cent. gold bonds shall remain outstanding and unpaid."

In other words, by this agreement the Eastern Illinois guaranteed $970,000 per year for five years and thereafter so long as any of said bonds should remain unpaid. This agreement, having been made by the directors, was submitted to and ratified by the stockholders at a meeting held on June 1, 1904. Out of 52,590 shares of preferred stock represented and 72,155 shares of common stock, 41,917 of the preferred and 72,124 common were represented by the proxy given to the Frisco road by the Colonial Trust Company, in spite of the written protest against such action sent by counsel for the plaintiff Kissel to the trust company.

It is not claimed that said agreement is ultra vires the corporation. Being an agreement within the powers of the company, and having been ratified at a meeting of the stockholders, ordinarily that would have been an end of this matter. But this was not an ordinary case. The stock trust agreement was in existence. As I read that agreement, this guaranty offends the language and intent thereof. I have no doubt that the limitations of said agreement against the issuing of stock, bonds, or certificates of indebtedness, or the use of the trust assets of said company for any other purpose than the payment of its own debts, obligations, betterments, and improvements, covers this guaranty. A

burden was put upon the road, which was pledged to be kept intact and without outside obligations or bonds to secure the payment of the dividends and the payment of the obligations to the stockholders, and the handing back to them of the road, in case of default, unimpaired and without additional burden. No matter what the form of words, no matter what the precise definition, may be, the intent of that instrument from many of its clauses clearly indicates that purpose, and by its terms the trustee thereunder was not only the trustee of the Frisco Company, the proposed purchaser of the stock, but of the certificate holders, who were the sellers thereof; for in express language they are made cestuis que trustent, and I think have a right to complain and to ask the interposition of a court of equity to prevent or to undo an act done to their detriment by the aid of their trustee in furnishing the Frisco Company the proxies by which it was able to approve the action of its directors in making this contract, which evidently is not for the benefit of the certificate trust holders, may be detrimental to their interests, and puts a serious obligation upon their security; and so it comes within the doctrine of waste, and as I understand it, a cestui que trust may have an action in equity to prevent waste of the trust estate by the trustee or through the agency of the trustee.

Nor is this action to be defeated under the requirement of the trust instrument, which provides that actions thereunder need not be brought by the trustee, except upon the request of 20 per cent. of the certificate holders. Before instituting this action the plaintiff wrote to his trustee, the Colonial Trust Company, requesting access to the register of the holders of stock trust certificates, which it had, in order to get the names of possible plaintiffs to join him in the suit. Although the trust agreement expressly provided for the keeping of such register, which "shall at all reasonable times be open for inspection by the trustee and by any holder of stock trust certificates," the trust company declined such leave without the permission of the San Francisco Company. This wasted valuable time. In the meanwhile the parties to the traffic agreement and plan based thereon were straining every nerve to put the scheme through. It seems insincere to claim that the suit must fail because 20 per cent. of the certificate holders did not join as plaintiffs in its inception, since the refusal to allow inspection of the records prevented such joinder until after the scheme was perfected, though the necessary number were joined as plaintiffs by order of the court after the suit was commenced. Further, those provisions were and are expressed in the instrument itself to be for the protection of the trustee. They had in view actions to declare or enforce the defaults therein stated. No default, as specifically provided for in the instrument, is here in suit. The act complained of is not under the trust instrument, but outside of the trust instrument. It affects the property held under the trust instrument, and is brought to prevent waste, and therefore it does not come within the provisions that a suit must be brought upon the request of 20 per cent. of the stock trust certificate holders. Furthermore, although the plaintiff, at the time he commenced the action, did not represent 20 per cent. of the certificate holders, yet since then other certificate holders have, under

orders of the court, been permitted to join in the action as parties plaintiff, bringing the amount now represented to over 20 per cent., as is conceded, and in addition thereto, while the Colonial Trust Company, the trustee under the instrument, was not a party plaintiff, yet in its answer it distinctly asked that, if the court should determine the agreement attacked to be invalid, it should be set aside and annulled, and at the end of the case, the court having so decided, it joined in asking for the relief prayed, and it was upon its motion that the judgment here appealed from was entered. So that we have in this equity case all of the stockholders, because the Colonial Trust Company is the stockholder of record, holding said stock, to be sure, for the beneficial interests of the Frisco Company, but also for the certificate holders, and over 20 per cent. of the trust certificate holders, beneficial owners of that stock, uniting in asking that a contract made by their directors shall be set aside as against the interests of the company and theirs. So that it does not seem to me that from any point of view any technical obstacle lies in the plaintiffs' way. This instrument was executed in violation of the terms and the spirit of the trust agreement, was made by interested parties for their own benefit, against the interests of the Chicago & Eastern Illinois Company, and against the interests of the beneficial owners of the stock, and ought to be set aside.

It has been suggested upon consultation, although not presented upon the argument or in the briefs of counsel, that this judgment ought not to be affirmed, because to do so would diminish the security covered by the mortgage upon the faith of which bonds were issued, and so diminish the security upon the faith of which the bondholders purchased. The record discloses that on the 26th of May, 1904, the plaintiff, through reputable counsel, wrote to the Colonial Trust Company, the trustee under the agreement, calling its attention to the terms of the so-called traffic agreement, and pointing out why, in the opinion of the writer, the agreement was not good in law or in morals, and requesting the trust company to take steps to prevent the stock of the Chicago & Eastern Illinois Railroad Company, of which it held the legal title, from being voted in approval of said agreement, and that the trust company refuse to give any proxy which could be used for such purpose, or that, if any proxy had been given, that it be revoked before the next meeting. On the same day the same counsel wrote to the president and board of directors of the St. Louis & San Francisco Railroad Company, protesting against the proposed action, requesting that the railroad company proceed no further with, but forthwith retire from, the pretended agreement of April 14, 1904, and stating:

"With this request you can readily comply, for the reason that you yourselves in your different capacities constitute all the parties to that agreement. You made the agreement with yourselves. You used the power conferred upon you, as the representative of the beneficial owners of the Chicago & Eastern Illinois Railroad Company stock, to benefit your own company and the St. Louis, Memphis & Southeastern Company, of which you own the entire capital stock, and, exercising the same power, you can retire from the agreement."

On June 1st he wrote to the president and board of trustees of the New York Security & Trust Company, the proposed trustee under the

proposed mortgage, calling its attention to the character of the transaction and stating:

"This information is communicated to you in order that you may not receive the conveyance of said traffic contract of April 14th without knowledge of its invalidity, and with great respect I hereby warn you in Mr. Kissel's behalf against permitting any bonds of said proposed $16,000,000 issue to go out with your certificate upon them into the hands of bona fide holders for value, without the purchasers having communicated to them the facts now put in your possession, showing that a portion of the security which purports to be conveyed to you in trust for the bondholders is invalid."

On June 1st the same counsel wrote to the Colonial Trust Company, stating:

"The natural effect of this transaction will be that the bonds being sold will pass into the hands of bona fide holders for value, who will take them upon reliance of the provisions which will purport to give them as a part of their security a right to have the earnings of the Chicago & Eastern Illinois Company, and in default of the earnings any of the assets and money of that company, applied to the payment of the interest upon their bonds until the bonds have been paid in full. These purchasers will, unless specially notified, be without knowledge of the facts which make the traffic agreement fraudulent and void as against you and as against your cestuis que trustent, for whose benefit you hold the stock of the Chicago & Eastern Illinois Company."

And he requested that the Colonial Trust Company bring suit to set aside the traffic agreement, and to restrain the execution and delivery of the mortgage, and to enjoin the issuing of bonds purporting to be secured by the said mortgage. On the 3d day of June, he wrote to Blair & Co., bankers, whom he had been informed were contemplating taking certain of the proposed bonds, informing them of Mr. Kissel's claim that the said traffic agreement was executed in fraud of the rights of persons holding a substantial interest in the stock of the Chicago & Eastern Illinois Railroad Company and was invalid, and that he contemplated proceedings to cause the same to be set aside, stating:

"Under these circumstances this traffic agreement cannot constitute a substantial security for an issue of bonds or notes, and this information is given to you in order that you may not be misled."

Notwithstanding these repeated warnings, the parties proceeded with the utmost alacrity to carry out the scheme, so that on the 10th of June the papers had been executed, and on the morning of the 11th of June bonds had been certified by the New York Security & Trust Company to the face amount of about $15,000,000. This action was commenced on the 11th of June, and a preliminary injunction was issued on the 13th. On the motion to continue said injunction pendente lite, this question seems to have been before the court, where the learned judge said (44 Misc. Rep. 156, 89 N. Y. Supp. 796):

"In the view I take of the case, however, it is unnecessary to consider more than the single question whether innocent purchasers for value of the bonds will be in any better position to enforce this traffic agreement against the Eastern Illinois System than would the original party to the agreement, the Southeastern Company, through whom they would derive their right; that company having included this traffic agreement with other assets under the mortgage given to secure these bonds. The well-established rule of law in the case of a chose in action is that the purchaser acquires no greater right than his vendor had. In Bush v. Lathrop, 22 N. Y. 535, 538, the Court of Appeals said: 'All the cases agree that the purchaser of a chose in action takes the

interest purchased, subject to all the defenses, legal and equitable, of the debtor who issued the security'—quoting Lord Thurlow in Davies v. Austin, 1 Ves. 247, that 'a purchaser of a chose in action must always abide by the case of the person from whom he buys.' This rule, as laid down in Bush v. Lathrop, supra, was said in Fairbanks v. Sargent, 104 N. Y. 108, 9 N. E. 870, 6 L. R. A. 475, 58 Am. Rep. 490, to stand in full force and unquestioned, except to the extent that, where the real owner had by the act of investing another with apparent ownership of the property estopped himself from disputing such title, the rule does not apply.  *  *  *  In the case in hand, so far from being guilty of any act which could be construed as an estoppel, the plaintiffs have shown the utmost diligence and energy in attacking the contract in question, and no one hereafter, whether a bondholder or other, will have good ground for complaining in this respect of anything that the plaintiffs have done or left undone.  Unless the rule of Bush v. Lathrop is held applicable to such a case as is here presented, it is difficult to conceive a case to which it would apply.  Where a going concern mortgages all its assets, including outstanding contracts, if the mortgagee or the owners of bonds secured by the mortgage should be held to have any greater or different rights than the concern itself upon such contracts, intolerable confusion and injustice would result."

With this disposition of the matter all parties to this suit have acquiesced. It is true the New York Security & Trust Company states in its brief:

"Without fault on its part, the trust company has been placed in a most embarrassing position."

That position is due to its act in certifying the bonds in the face of full information and timely warning. That in spite of said information and warning it decided to take the risk and make its certification, and may therefore be liable thereon, presents no question worthy of consideration in this case.

It seems to me that all we have to do is to decide the questions presented to us upon this appeal, and that upon those questions the judgment appealed from was right, and should be affirmed, with costs to the respondents.

